# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KING NOBLEMIND MEEK-FREEMAN          *

      **Plaintiff,**          *

v.          *          **Civ. No. DLB-24-444**

GOV. WES MOORE, *et al.*,          *

      **Defendants.**          *

## MEMORANDUM OPINION

King Noblemind Meek-Freeman (a/k/a Derrick LaMonte Carroll), a sentenced prisoner who is proceeding without counsel, filed this civil rights action pursuant to 42 U.S.C. § 1983 against Governor Wes Moore, Commissioner Philip Morgan, Warden Jeff Nines, Warden Ronald Weber, Officer Brian T. Schrock, Officer Brandon Self, Sergeant Joseph Upole, Officer Miranda Winters, Officer Colton Davis, Officer John Doe, North Branch Correctional Institution ("NBCI") Administrative Remedy Procedure ("ARP") Coordinator Lt. Scott Beeman, Lt. Jeffrey Brewer, Officer Brant Kitzmiller, Officer Brian K. Schrock, Lt. Allen Whiteman, Western Correctional Institution ("WCI") Case Managers, and the Medical Department for NBCI ("Medical Department").[1] Meek-Freeman alleges that the defendants failed to protect him from harm, subjected him to excessive force and retaliation, and denied him access to the courts in violation of his constitutional rights.

The Medical Department filed a motion to dismiss on December 20, 2024. ECF 18. The remaining defendants ("state defendants"), excluding Doe, filed a motion to dismiss or, in the alternative, for summary judgment on March 6, 2025, along with a motion to seal. ECF 24 & 26.

---

[1] The Clerk shall correct the spelling of the plaintiff's and the defendants' names on the docket.

Meek-Freeman has filed a motion for a protective order and request for counsel, a motion for relief from judgment, and a Rule 56(d) declaration. ECF 14, 20, & 21. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons that follow, the Medical Department's motion to dismiss is granted. The state defendants' motion to dismiss or for summary judgment, treated as a motion to dismiss, is granted in part and denied in part. Meek-Freeman's claims against Doe also are dismissed. Meek-Freeman's request for a protective order and his motion for relief from judgment are denied. His request for counsel is granted. The state defendants' motion to seal is granted.

## I.      Background

The following facts are derived from Meek-Freeman's verified complaint.

Meek-Freeman was the plaintiff in *Carroll v. Tobesman, et al.*, a civil action in this district in which he alleged, among other claims, that certain Maryland correctional personnel had denied him kosher meals in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act. ECF 1, at 7. On February 21, 2023, the Honorable Paula Xinis issued a memorandum opinion in that case in which she denied the defendants' motion for summary judgment, denied Meek-Freeman's motion to amend his complaint, and appointed pro bono counsel to represent Meek-Freeman. *Id.*; *see also* ECF 48 in *Carroll v. Tobesman, et al.*, No. PX-20-2110 (D. Md. Feb. 21, 2023) (mem. op.). Meek-Freeman received a copy of that opinion via legal mail on February 22, 2023. ECF 1, at 7.

The following morning, February 23, 2023—which Meek-Freeman states also was the "anniversary of the double murder [he was] wrongfully convicted of"—eight officers came to his cell at NBCI and looked at him suspiciously through the cell window. *Id.* After lunch, Upole and Winters returned to search his cell. *Id.* at 7–8. They told Meek-Freeman that his mat was "too big" and needed to be assessed. *Id.* at 8. When Upole and Winters entered Meek-Freeman's cell, out of

view of the camera, they "began to aggressively throw [his] stuff around." *Id.* Upole stepped on Meek-Freeman's fan and cracked it. *Id.* When Upole cracked his fan, Meek-Freeman told Upole that he (Meek-Freeman) was going to "write it up." *Id.* The officers searched for 30 minutes but discovered no contraband. *Id.*

Upole then left and returned about ten minutes later. *Id.* After he returned, he reached into his right pocket and "got something." *Id.* He then falsely claimed to have found an SD card in Meek-Freeman's cell.[2] *Id.* Meek-Freeman was placed in a holding cell while Upole and Winters continued to search his cell. *Id.* When Meek-Freeman asked why he was being prevented from watching the search, Upole told Meek-Freeman that he had "made the wrong person mad." *Id.* at 8–9. Upole and Winters confiscated many valuable pieces of Meek-Freeman's property, including religious materials and legal paperwork related to his post-conviction litigation. *Id.* at 16–17. Meek-Freeman was later moved to lockup, and he received a write-up as well as several property confiscation forms. *Id.* at 9; *see also* ECF 1-4 & 1-16. Meek-Freeman states that he was placed in lockup because Upole "wrote a false write-up" and that Upole wrote that write-up "because he broke [Meek-Freeman's] fan and [Meek-Freeman] told him that [he] had to write it up." ECF 1, at 23.

Meek-Freeman has attached to his complaint the property confiscation forms that he received, which are dated the same day as the cell search. ECF 1-4. He also has attached an "inmate hearing record" dated March 14, 2023 that describes the rule violations he was charged with as a result of the search and that contains findings of fact by a hearing officer. ECF 1-16. The property

---

[2] An SD, or secure digital, card "is a type of removable storage device used to store and transfer digital data. It is commonly used in electronic devices such as digital cameras, smartphones, tablets, and portable gaming consoles." *SD Cards*, Lenovo, https://www.lenovo.com/us/en/glossary/sd-cards/ (last visited Sept. 18, 2025).

confiscation forms state that the following property was confiscated from Meek-Freeman: "2 [b]ox[e]s paperwork"; "112 stamps"; "12 Xbox games"; "1 pair boots"; "2 [a]ltered pillows"; "1 [a]ltered bag"; "1 tv not right #"; "1 tv missing screws"; "1 Xbox tape is off"; "1 broken fan"; "3 Xbox controllers wrong # + tampered"; "1 [a]ltered [h]eadphones"; "1 surge protector no #"; "1 [a]ltered remote"; "1 book light wrong #"; "1 Xbox hard drive tape tampered"; "1 broken sunglasses"; "1 broken glasses"; "1 broken hairbrush"; "8 tampered cords"; "2 sets earbuds tampered"; "1 broken [a]larm clock"; and "1 [h]airclipper wrong #." ECF 1-4, at 1–3. The inmate hearing record states that, following the search, a hearing officer found Meek-Freeman guilty of two rule violations based on his alleged possession of an SD card and his argumentative and disruptive behavior during the search. ECF 1-16, at 3.

On March 6, 2023, Meek-Freeman gave Davis some important legal mail, including original documents, to send to his lawyer, along with a "money slip" to allow approximately $200.00 worth of food and other items to be sent to Meek-Freeman's family. *Id.* at 17. Meek-Freeman was later told by his lawyer that this mail never arrived. *Id.* Meek-Freeman also learned that someone who was supposed to receive his money slip had not received it and that, as a result, someone (whom he does not identify) had destroyed "$200.00 worth of unopen[ed] brand[]new food." *Id.*

While in lockup in connection with the February 23, 2023 cell search, Meek-Freeman learned that some correctional officers wanted him to be attacked. *Id.* at 9. Upon his release from lockup, Meek-Freeman was placed on a tier with an inmate named Phillip Jackson, his "only known enemy" in the Maryland prison system. *Id.* Meek-Freeman was placed in cell 2B12, and Jackson was assigned to cell 2B14. *Id.* These cells were in the same "line-up." *Id.* Meek-Freeman

explains that a line-up is a group of "about [ten] cells." *Id.* at 10. Inmates in different line-ups are not permitted to be out of their cells at the same time. *Id.*

On or about April 18, 2023, Meek-Freeman asked to be moved to different housing because he believed he was in danger. *Id.* Doe, an unidentified "tier officer," moved Meek-Freeman "a couple cells down" from where he had been housed, but Doe did not move him to a different tier or a different building. *Id.* at 9–10. Meek-Freeman does not state explicitly whether Doe moved him out of Jackson's line-up. However, he does state that as of April 20, 2023, he "slept in cell 60 something." *Id.* at 10. A report from Brewer attached to Meek-Freeman's complaint further indicates that, on April 20, 2023, Meek-Freeman was in a line-up containing cells 2B57–2B64. *See* ECF 1-26, at 8 (stating that Meek-Freeman was housed in cell "2-B-61" and that he was attacked "as cells 57 to 64 were exiting the wing for outside recreation").

On April 20, 2023, an inmate attacked Meek-Freeman from behind and stabbed him in the head with a six-inch metal shank as he was walking out to the recreation area. ECF 1, at 10, 11. Meek-Freeman does not identify his attacker in the body of his complaint, but he has attached documents to his complaint (including Brewer's report and grievances that Meek-Freeman filed after the attack) that identify the attacker as an inmate named Edward Martin. *See, e.g.*, ECF 1-26, at 8; ECF 1-29, at 1–2; ECF 1-30, at 1. Martin ambushed Meek-Freeman from the shower area, which was supposed to be locked when an inmate was inside it. ECF 1, at 10. Moreover, Martin resided in a different line-up and thus should not have been out of his cell at the same time as Meek-Freeman. *Id.*

After Meek-Freeman was stabbed, Brewer and Kitzmiller—who had witnessed the attack, saw that Meek-Freeman was unarmed, and could see blood running out of Meek-Freeman's head—maced Meek-Freeman in his open head wound. *Id.* at 10–11, 24.

Meek-Freeman was then placed in a shower for 30–45 minutes, but he did not receive soap or any other medications to treat his injury. *Id.* at 11. Meek-Freeman repeatedly requested to be seen by a doctor or given an X-ray and submitted numerous sick call slips following the attack, but he was never seen by a medical provider. *Id.*

Meek-Freeman was charged with a rule violation in connection with the attack and was moved to lockup. *Id.* at 11–12. While there, sometime between 3 and 11 p.m. on the day of the attack, he observed Doe go into the cell across from him and drop something on the bed. *Id.* at 12. Meek-Freeman states that the cell he observed Doe go into was Martin's cell. ECF 1-28, at 1. Meek-Freeman also states that, earlier in the day, he had received $88.00 worth of food from the prison commissary, which went missing after the attack. *Id.*

A few days later, Meek-Freeman's disciplinary charge stemming from the attack was dismissed, and he was placed in administrative segregation. *Id.* While he was housed there, none of his property was returned to him. *Id.* Meek-Freeman made numerous complaints to "any and everyone [he] could" about his missing property, to no avail. *Id.*

On May 17, 2023, Meek-Freeman was taken to the property room to have what he describes as a "'so-called' hearing" about his missing property. *Id.* at 13. During this hearing, the property officer produced boxes containing Meek-Freeman's property. *Id.* Everything the officer took out of the boxes was broken. *Id.* The officer told Meek-Freeman that his property had been broken to "teach [him] a lesson." *Id.* Meek-Freeman was able to recover all his papers and a few other items that had not been broken, but none of his broken property was returned to him. *Id.* at 13–14. The officer told Meek-Freeman that his broken property would have to be thrown away. *Id.* at 13.

While Meek-Freeman was in administrative segregation, his cell was searched again, and he and his cellmate were written up for loose screws in the "light panel that the light switch [was]

6

in." *Id.* at 14. Meek-Freeman's cellmate was sent to the regular lockup tier, but Meek-Freeman was placed in a cell covered in human feces and urine on the tier holding "mentally insane inmates." *Id.* When he asked why he had been placed there, he was told that it had been done at the direction of Sgt. Crowe (who is not a defendant in this case). *Id.* at 15.

Meek-Freeman remained on that tier for a few days before being informed that he was being transferred to WCI. *Id.* Upon arrival at WCI, Meek-Freeman was told he did not need to complete his lockup time and was getting a "fresh start." *Id.* A case manager assigned him to a work detail in the kitchen. *Id.*

At some point thereafter, however, Brian K. Schrock unexpectedly changed Meek-Freeman's work shift.[3] *Id.* at 15. Correctional officers began to ask Meek-Freeman odd questions, including whether he was Jewish and whether he had a Twitter account. *Id.* at 16. One officer told Meek-Freeman that he "didn't like [his] type," and some officers made rude comments about Meek-Freeman's hair. *Id.* Shortly thereafter, Brian K. Schrock falsely claimed that Meek-Freeman was trying to take something from the kitchen, and Meek-Freeman was fired as a result. *Id.*; ECF 1-33. Meek-Freeman never received a write-up, nor was he told what he had done wrong. ECF 1, at 15.

Meek-Freeman believes that Brian K. Schrock may have targeted him because Brian K. Schrock has the same last name as Brian T. Schrock, a correctional officer at NBCI whom Meek-Freeman previously accused of improperly strip-searching him three times following non-contact visits. *Id.* at 16; ECF 1-33, at 4. During the second and third strip search, Brian T. Schrock made comments about Meek-Freeman's genitals. ECF 1, at 22. Meek-Freeman states that there was no

---

[3] The Court will refer to Brian K. Schrock and Brian T. Schrock by their full names to avoid confusion.

basis for these strip searches because he had gone through an X-ray machine before each visit. *Id.* Meek-Freeman had filed a grievance about these strip searches, but the grievance was dismissed. ECF 1-33, at 4.

Finally, Meek-Freeman asserts that, within the Maryland state prison system, there is a toxic culture that divides along racial lines. ECF 1, at 17. Due to an "unwritten policy of segregating correctional officers by race," Black officers generally work in Baltimore and Jessup while white officers work mostly in Cumberland and Hagerstown. *Id.* at 17, 21. This culture allows a small group of white supremacists to work as correctional officers. *Id.* at 18. Some members of this group openly wear t-shirts displaying "pro-slavery images and themes." *Id.* Meek-Freeman states that in a prison system where most inmates are Black and Latino, the conduct of these correctional officers serves as a "living symbol of racism and . . . oppression." *Id.* Meek-Freeman contends that this "toxic culture" and the officers' white supremacist conduct have been fostered and tacitly condoned by Gov. Moore, Commissioner Morgan, Warden Nines, and Warden Weber. *Id.* at 21–22.

Meek-Freeman believes that the various injuries he has suffered are due to a campaign of "calculated harassment" by the group of white supremacist officers, who resent him for the crime that they believe he committed (murdering an elderly white couple), his opposition to white supremacy, and his prior litigation against Maryland correctional personnel. *Id.* at 18–19, 21–22.

Based on the foregoing allegations, Meek-Freeman asserts that the defendants violated his First, Fourth, Eighth, and Fourteenth Amendment rights, as well as the Prison Rape Elimination Act ("PREA"). *Id.* at 21–25. He sues the defendants in both their individual and official capacities. *Id.* at 7. He seeks declaratory and injunctive relief, as well as monetary damages totaling $35 million. *Id.* at 25–26.

## II.    Standard of Review

The state defendants and the Medical Department contend that Meek-Freeman's complaint should be dismissed for failure to state a claim. ECF 18, at 1; ECF 24, at 1.Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678)). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and "draw all reasonable inferences in favor of" the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). But the court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d

230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

Meek-Freeman drafted his complaint and opposed the pending motions without the assistance of counsel. "[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Accordingly, the court must construe *pro se* pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020). But "liberal construction does not require [the court] to attempt to 'discern the unexpressed intent of the plaintiff[;]'" the court need only "determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)). Thus, a *pro se* complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'" *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (quoting *King*, 825 F.3d at 214 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).

## III.    Discussion

The United States Code provides a federal cause of action for any individual who believes a state actor has deprived him or her of a constitutional right. *See* 42 U.S.C. § 1983; *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). The statute "is not itself a source of substantive rights, but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Two elements are essential to state a claim under § 1983: (1) the plaintiff must have suffered a deprivation of "rights, privileges or immunities secured by the

Constitution and laws" of the United States; and (2) the act or omission causing the deprivation must have been "committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 45 n.3, 48 (1988) (quoting 42 U.S.C. § 1983).

### A.  The Medical Department's Motion to Dismiss

Meek-Freeman alleges that the Medical Department failed to provide medical care after he was stabbed and maced. The Medical Department moves for dismissal of the complaint because it is not a "person" who is subject to suit under 42 U.S.C. § 1983. ECF 18-1, at 4. The Court agrees.

Only "persons" may be sued under § 1983. *See, e.g.*, *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975); *see also West*, 487 U.S. at 48 (noting an element of § 1983 claim is that "person" acting under color of state law committed the violation). Though the Fourth Circuit does not appear to have issued a precedential decision addressing whether a prison medical department qualifies as a person within the meaning of § 1983, it has, in an unpublished opinion, concluded that it does not. *See Harden v. Green*, 27 F. App'x 173, 178 (4th Cir. 2001) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989); *Fischer v. Cahill*, 474 F.2d 991, 992 (3d Cir. 1973)). Judges of this district have followed suit. *See, e.g.*, *Blankumsee v. Med. Dep't at ECI*, No. PWG-18-106, 2020 WL 13644337, at *2 (D. Md. Feb. 7, 2020), *aff'd sub nom. Blankumsee v. Foxwell*, 813 F. App'x 893 (4th Cir. 2020); *Houck v. Wexford Health Sources, Inc.*, No. GJH-15-3639, 2016 WL 6634858, at *2 (D. Md. Nov. 7, 2016). The Court concludes that the Medical Department is not a "person" subject to suit under § 1983, and that it must be dismissed as a party to this action. Meek-Freeman's claim against the Medical Department is dismissed with prejudice.

**B. State Defendants' Motion to Dismiss**

     **1. Claims Against Whiteman, Beeman, and WCI Case Managers**

The state defendants argue that Meek-Freeman fails to state a claim against Whiteman, Beeman, and WCI Case Managers because he makes no specific allegations about what they did or did not do. The Court agrees.

Meek-Freeman makes no allegations against Whiteman at all. He thus fails to state a claim against him. *See, e.g.*, *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 397 (4th Cir. 1990). Meek-Freeman's only allegation against Beeman is that he "failed to honor [his grievances] in good faith" and committed "obstruction," thereby violating his due process rights. ECF 1, at 24. His only allegation against the WCI Case Managers is that they "violated the due process clause, fail[ed] to properly house [him], and [violated] [e]qual [p]rotection." *Id.* Meek-Freeman offers no facts to support either conclusory allegation. He does not explain what Beeman did or did not do that constituted obstruction or evidenced a lack of good faith. Nor does he explain which WCI Case Managers failed to properly house him, how they did so, or how their actions amounted to a violation of due process or equal protection. *See, e.g.*, *Langford v. Joyner*, 62 F.4th 122, 125 (4th Cir. 2023) (complaint that made "only collective allegations against all 'Defendants,' without identifying how each individual Defendant personally interacted with [the plaintiff] or was responsible for the denial of his . . . rights" failed to state a claim). Meek-Freeman's allegations against Beeman and the WCI Case Managers amount to "'unadorned, the-defendant-unlawfully-harmed-me accusation[s]' and 'legal conclusions' that are insufficient to survive a Rule 12(b)(6) motion to dismiss." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Meek-Freeman's claims against Whiteman, Beeman, and WCI Case Managers are dismissed without prejudice.

### 2.   Claims Against Gov. Moore, Commissioner Morgan, Warden Nines, and Warden Weber

The state defendants argue that Meek-Freeman fails to state a claim for supervisory liability against Gov. Moore, Commissioner Morgan, Warden Nines, and Warden Weber. The Court agrees.

A defendant's own action—or failure to act—is required for liability under § 1983. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). There is no *respondeat superior* liability under § 1983. *Love-Lane*, 355 F.3d at 782. An official like these defendants may be found liable only if the plaintiff shows the official "acted personally in the deprivation of the plaintiff['s] rights." *Vinnedge*, 550 F.2d at 928 (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md.), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)).

An official may be liable under § 1983 for the actions of their subordinates. To state a claim for supervisor liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had "actual or constructive knowledge" that the subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the supervisor responded in a manner that was "so inadequate as to show deliberate indifference to or tacit authorization of" the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Meek-Freeman does not claim that Gov. Moore, Commissioner Morgan, Warden Nines, or Warden Weber personally took any racially discriminatory action towards Meek-Freeman but rather that their policies created a toxic environment. None of his allegations, however, indicates that any of these four defendants was aware of racist conduct by prison staff. Even if the Court

assumed that these defendants were constructively aware because staff were wearing clothing with white supremacist imagery, Meek-Freeman does not explain how they were deliberately indifferent to that behavior. His conclusory claim that racial discrimination went "unchecked" by these defendants is insufficient to state a claim for supervisory liability.

Meek-Freeman's claims against Gov. Moore, Commissioner Morgan, Warden Nines, and Warden Weber are dismissed without prejudice.

### 3. Claim Against Self

Meek-Freeman claims that Self violated his due process rights by throwing away his property without good reason.[4] The state defendants argue that these allegations fail to plausibly allege a due process violation. The Court agrees.

In *Hudson v. Palmer*, the Supreme Court held that a prisoner cannot state a claim for a procedural due process violation for property lost, destroyed, or stolen by a state actor acting in a "random and unauthorized" manner, so long as the state provides the prisoner adequate post-deprivation process. 468 U.S. 517, 533 (1984); *see Parratt v. Taylor*, 451 U.S. 527, 540 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). Meek-Freeman alleges that Self threw his property away "without any just reason or paperwork"—i.e., in an unauthorized manner. ECF 1, at 22. However, Meek-Freeman cannot state a due process claim because Maryland affords him adequate post-deprivation process to redress his injuries. Under Maryland law, he may file an administrative grievance and seek damages and injunctive relief for the deprivation of his property in state court. *See, e.g.*, *Hawes v. Foxwell*, No. DKC-17-2598, 2018

---

[4] For purposes of this analysis, the Court assumes—construing Meek-Freeman's complaint generously in his favor—that Self is the unnamed property officer who allegedly told Meek-Freeman that his property had been broken to teach him a lesson and that his broken property would have to be discarded.

WL 2389060, at *4 (D. Md. May 25, 2018) ("The right to seek damages and injunctive relief in Maryland through the Maryland Tort Claims Act and Inmate Grievance Office constitutes an adequate post-deprivation remedy."); *Smith v. Armstead*, No. JRR-22-523, 2023 WL 6111871, at *10 (D. Md. Sept. 16, 2023) (citing *Hawes* for same proposition).

Meek-Freeman's claim against Self is dismissed with prejudice.

### 4.  Claims Against Upole and Winters

Meek-Freeman claims that Upole and Winters violated his First, Fourth, and Eighth Amendment rights when—in retaliation for his success in the *Carroll* lawsuit—they searched his cell and destroyed his property. Meek-Freeman also claims that during the unlawful search of his cell, Upole and Winters retaliated against him again. On his account, Upole broke his fan while he and Winters searched his cell, Meek-Freeman threatened to file a grievance against Upole for it, and in response, Upole and Winters planted an SD card on him during the search and sent him to lockup on false pretenses. The state defendants argue that these claims should be dismissed for failure to state a claim. The Court disagrees as to the First Amendment claim but agrees as to the Fourth and Eighth Amendment claims.

### a.  First Amendment

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim for First Amendment retaliation, "a plaintiff 'must allege that (1) []he engaged in protected First Amendment activity, (2) the defendant[] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the

defendant's conduct.'" *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005)).

A prisoner engages in First Amendment protected activity when he exercises his "right 'to petition the Government for a redress of grievances.'" *Id.* (quoting *Kirby v. City of Elizabeth City*, 388 F.3d 440, 448 (4th Cir. 2004) (quoting U.S. Const. amend. I)). Filing administrative grievances and lawsuits constitutes protected activity. *Id.*; *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017) ("[T]his Court has long held that prison officials may not retaliate against prisoners for exercising their right to access the courts, which is a component of the right to petition for redress of grievances.") (citations omitted).

An adverse action, in the context of First Amendment retaliation claims, is "conduct that would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500 (quoting *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)). In other words, the conduct of which the plaintiff complains must present more than a "*de minimis* inconvenience." *Id.* (quoting *Am. Civ. Liberties Union of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 786 n.6 (4th Cir. 1993)). Whether a "person of ordinary firmness" would likely be chilled by particular conduct is an objective inquiry and does not "depend[] upon the actual effect of the retaliatory conduct on a particular plaintiff." *Id.* Thus, "[w]hile the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive." *Id.* The court must assess the chilling effect of the challenged conduct "on a case-by-case basis, considering the actors involved and their relationship." *Snoeyenbos v. Curtis*, 60 F.4th 723, 731 (4th Cir. 2023).

To plausibly allege a causal link between his protected activity and the defendant's adverse action, a plaintiff must plead sufficient facts to indicate that "the defendant was aware of [his]

engaging in protected activity" and that there was "some degree of temporal proximity" between

that activity and the retaliatory act. *Williams v. Mitchell*, 122 F.4th 85, 89 (4th Cir. 2024) (quoting

*Constantine*, 411 F.3d at 501); *see also Gowen v. Winfield*, 130 F.4th 162, 174 (4th Cir. 2025) ("At

the pleading stage, alleging temporal proximity between protected First Amendment activity and

a retaliatory act satisfies the causation element when the official is aware of the First Amendment

activity.").

Meek-Freeman's allegations satisfy both the first and third elements of a First Amendment

retaliation claim. He alleges that he filed *Carroll*, a lawsuit against correctional personnel, which

qualifies as protected activity. He also has alleged facts from which the Court can plausibly infer

a causal connection between his lawsuit and the cell search, property confiscation and destruction,

and resulting disciplinary charges. In particular, Meek-Freeman alleges that the search—during

which Upole and Winters destroyed and confiscated his property and planted contraband—

occurred one day after Meek-Freeman received a favorable ruling in *Carroll*. *See, e.g.*, *Williams*,

122 F.4th at 89 (where plaintiff alleged that he recorded police officer during arrest and used that

recording to secure dismissal of criminal charges by proving that officer had lied under oath, 15-

day period between dismissal of charges and adverse action sufficient to allege temporal

proximity). Meek-Freeman also alleges that, during this search, Upole told him that he had "made

the wrong person mad," which suggests Upole and Winters were aware of Meek-Freeman's

success in his lawsuit against other correctional personnel.[5]

---

[5] For these reasons, the Court rejects the state defendants' characterization of Meek-Freeman's allegations of causation as "bald and conclusory," as well as their argument that because Upole and Winters were not parties to *Carroll*, "they would have had no knowledge of the outcome of that case." ECF 24-1, at 25. Meek-Freeman has pled specific, and sufficient, facts from which the Court can plausibly infer that Upole and Winters knew about *Carroll*—even if they were not parties to the case—and undertook adverse action in retaliation for Meek-Freeman's success in that case.

As for the second element, adverse action, the Court concludes that Meek-Freeman also has plausibly alleged it. At the outset, the Court notes that the Fourth Circuit does not yet appear to have addressed in a published opinion whether and under what circumstances the confiscation and destruction of an inmate's property during a cell search may qualify as adverse action for purposes of a First Amendment retaliation claim. Other circuits that have considered the question have reached varied conclusions. Some have concluded that confiscating a prisoner's property is an adverse action that supports a First Amendment retaliation claim. *See Richards v. Perttu*, 96 F.4th 911, 918 (6th Cir. 2024) ("confiscating an inmate's legal papers and other property constitutes a sufficient injury to support a First Amendment retaliation claim") (quoting *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002)), *aff'd*, 605 U.S. 460 (2025); *Morris v. Scott*, 840 F. App'x 14, 15 (7th Cir. 2021) (concluding that a "targeted search and confiscation of [an inmate's] property . . . would likely dissuade a person or ordinary firmness from exercising further First Amendment activity"); *Hall v. Sutton*, 755 F.2d 786, 787 (11th Cir. 1985) (per curiam) (allegation that prison officials confiscated inmate's tennis shoes in retaliation for prior lawsuit stated claim for First Amendment retaliation), *and Parks v. Wren*, 651 F. App'x 597, 599 (9th Cir. 2016) (allegations that defendant "searched [inmate's] cell, destroyed his property, and left his cell in 'total discombobulation' in retaliation for [his] filing of a grievance" stated retaliation claim). Other circuits have concluded that the confiscation of a small amount of property is a *de minimis* injury that cannot support a retaliation claim. *See Zaire v. Coryer*, 204 F. App'x 948, 949 (2d Cir. 2006) (confiscation of a towel was *de minimis* injury), *and Sossamon v. Williams*, 270 F. App'x 323, 325 (5th Cir. 2008) (affirming conclusion that confiscation and destruction of inmate's "multi-plug" device was *de minimis* injury); *see also Pope v. Bernard*, No. 10-1443, 2011 WL 478055, at *2 (1st Cir. Feb. 10, 2011) (confiscation of inmate's Kufi from his cell was *de minimis*

injury in light of inmate's lack of reasonable expectation of privacy in his cell and fact that no disciplinary charge was filed).

District court decisions in the Fourth Circuit run the gamut. Some district courts have found an adverse action when the prisoner alleged his property was confiscated, *see Rader v. Bailey*, No. 1:20-cv-1423, 2024 WL 844855, at *7 (E.D. Va. Feb. 27, 2024) (confiscation of inmate's book titled "Hearsay Handbook" "could satisfy the 'adverse action' element of a retaliation claim"), or when the prisoner alleged his property was destroyed and an officer assaulted him, *see Jordan v. Large*, No. 7:16-cv-468, 2018 WL 1158422, at *5 (W.D. Va. Mar. 5, 2018) (claim that sergeant "broke [inmate's] headphones and radio and kicked him in the testicles" sufficiently alleged adverse action). Other courts have found a prisoner did not allege an adverse action when the confiscated or destroyed property was minimal or not clearly identified. *E.g.*, *Edwards v. King*, No. 7:21-cv-47, 2021 WL 1396463, at *2 (W.D. Va. Apr. 13, 2021) ("[T]he confiscation of an affidavit, without more, does not constitute a sufficiently adverse action . . . ."); *Canty v. Corcoran*, No. GLR-18-1404, 2020 WL 6889258, at *17 (D. Md. Nov. 23, 2020) (allegations that officers "threw books, clothes, pictures and toiletries around" during cell search and that these "items were destroyed" insufficient to allege adverse action where inmate did not "identify[] with specificity what items were destroyed or otherwise harmed"); *Mohammed v. Beaver*, No. 5:18-cv-165-MR, 2021 WL 1147169, at *10 (W.D.N.C. Mar. 25, 2021) (allegations that defendants scattered inmate's belongings, "stepped on bags of cereal," and confiscated "religious headgear and ink pens" alleged only a "*de minimis* inconvenience"), *aff'd*, No. 21-7404, 2022 WL 986679 (4th Cir. Mar. 31, 2022).

Against this backdrop, the Court considers whether Meek-Freeman alleges Upole and Winters inflicted upon him a *de minimis* inconvenience or whether he alleges their conduct "would

'likely deter a person of ordinary firmness from the exercise of First Amendment rights.'"
*Snoeyenbos*, 60 F.4th at 731 (quoting *Constantine*, 411 F.3d at 500). Whether Meek-Freeman has
sufficiently alleged adverse action depends on the specific facts of his case. *See id.* (inquiry into
whether conduct constitutes adverse action is conducted on a "case-by-case basis"). Here, the
Court finds that Meek-Freeman has sufficiently alleged an adverse action. His alleged injury is
quantitatively and qualitatively more severe than the injuries prisoners have alleged in the mine
run of cases in this circuit in which courts have dismissed retaliation claims involving the
destruction and confiscation of property.

First, Meek-Freeman alleges the officers broke and confiscated a significant amount of his
personal property. The property confiscation slips that Meek-Freeman has attached to his
complaint identify 23 discrete items of confiscated property, including televisions, glasses,
electronic devices, paperwork, postage, bedding, shoes, and personal grooming items. ECF 1-4, at
1–2. Indeed, 23 items is arguably an undercount, given that some items are listed as multiples (e.g.
"8 tampered cords," "2 box[e]s paperwork," "12 Xbox games"). This volume of confiscated
property far exceeds the quantity of property confiscated in other cases in which courts concluded
the injury was *de minimis*. *Cf., e.g.*, *Edwards*, 2021 WL 1396463, at *2 (affidavit); *Ofori v.
Fleming*, No. 7:20-cv-345, 2021 WL 4462922, at *8 (W.D. Va. Sept. 29, 2021) (charger and
batteries); *Ballance*, 2002 WL 32074716, at *5 (book, lawsuit, six legal cases, manuscript,
manuscript illustrations, headphones).

Second, Meek-Freeman has identified his confiscated property with specificity. Unlike the
plaintiff in *Canty*, who made only general allegations that his property had been destroyed without
"identifying with specificity what items were destroyed or otherwise harmed," 2020 WL 6889258,
at *17, Meek-Freeman has provided a detailed list of the property confiscated by attaching the

property confiscation slips to his complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")

Third, Meek-Freeman alleges facts that suggest the confiscation and destruction of his property was not the only retaliatory action. On Meek-Freeman's account, Upole and Winters planted contraband on him during the cell search and had him sent to lockup on false charges. From these allegations, the Court plausibly infers that Upole and Winters engaged in additional adverse actions during the cell search in retaliation for Meek-Freeman's success in *Carroll*. Such conduct, on its own, likely would chill a "person of ordinary firmness" from exercising his First Amendment rights. *See, e.g.*, *Gowen,* 130 F.4th at 173 ("Placement in solitary confinement isolation is an adverse action."); *Martin*, 858 F.3d at 250 ("Certainly, 'placing an inmate in administrative segregation could "deter a person of ordinary firmness from exercising his First Amendment rights."'") (quoting *Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000) (quoting *Dunham-Bey v. Holden*, No. 98-15220, 198 F.3d 244, 1999 WL 1023730, at \*2 (6th Cir. Nov. 5, 1999) (unpublished table disposition))); *Booker v. S.C. Dep't of Corr.*, 583 F. App'x 43, 44 (4th Cir. 2014) (filing of false disciplinary charge can constitute adverse action).[6] But when considered in combination with the property confiscation and destruction, sending Meek-Freeman to lockup under false pretenses has an even stronger chilling effect.

---

[6] Meek-Freeman appears to claim that Upole and Winters's planting of contraband and filing of false disciplinary charges was done in retaliation for Meek-Freeman threatening to file a grievance against Upole when he broke his fan during the search. The Court can plausibly infer from the factual allegations in the complaint that Upole and Winters's conduct was in retaliation for Meek-Freeman's success in *Carroll*. But the Court notes that filing a grievance also clearly qualifies as First Amendment protected activity, *see, e.g.*, *Martin*, 858 F.3d at 249; that Meek-Freeman alleges a temporal proximity of less than an hour between his threat and the alleged planting of the SD card; that, on the facts as alleged, the Court can infer that Upole and Winters were aware that Meek-Freeman intended to file a grievance because he made the threat to them directly; and that a false disciplinary charge and placement in lockup, on their own, constitute adverse action under Fourth Circuit law.

The Court finds that Meek-Freeman has plausibly alleged a claim of First Amendment retaliation against Upole and Winters.

### b.    Fourth Amendment

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures.'" *King*, 825 F.3d at 214 (quoting U.S. Const. amend. IV). A person invoking the Fourth Amendment's protections must be able to "claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Id.* (quoting *Hudson*, 468 U.S. at 525 (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979))).

Meek-Freeman fails to plausibly allege a violation of the Fourth Amendment. In *Hudson*, the Supreme Court held that an inmate does not have a reasonable expectation of privacy in his prison cell. 468 U.S. at 530. Because Meek-Freeman does not have a reasonable expectation of privacy in his cell, Upole and Winters did not violate the Fourth Amendment when they searched his cell.

### c.  Eighth Amendment

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment in violation of the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To state an Eighth Amendment claim, a prisoner must allege both that he suffered a "deprivation" or "injury" that was objectively "sufficiently serious" and that the official he accuses of injuring him "acted with a sufficiently culpable state of mind." *Williams*, 77 F.3d at 761.

The Supreme Court in *Hudson* left open the possibility that the Eighth Amendment could provide a remedy for prison officials' invasion of an inmate's property rights. *See Hudson*, 468 U.S. at 530. Since *Hudson*, however, multiple courts of appeals outside the Fourth Circuit have concluded that, at least absent extraordinary circumstances constituting an objectively serious deprivation or injury, a prison official's seizure and/or destruction of personal property does not violate the Eighth Amendment. *See, e.g.*, *Thomas v. N.M. Corr. Dep't*, 272 F. App'x 727, 729–30 (10th Cir. 2008) (allegations of property deprivation did not rise to level of Eighth Amendment violation where prisoner failed to allege that he was deprived of essential human needs or that officials acted with deliberate indifference); *Durham v. Dep't of Corr.*, 173 F. App'x 154, 156 (3d Cir. 2006) (prisoner's allegations that he was deprived of Elijah Muhammad and Louis Farrakahn paintings and subjected to religious slurs did not rise to level of Eighth Amendment violation); *Nigro v. Wilson*, No. 95-56347, 122 F.3d 1073, 1997 WL 542008, at *1 (9th Cir. Aug. 28, 1997) (unpublished table decision) (affirming dismissal of Eighth Amendment claim regarding destruction of property).

Here, Meek-Freeman does not sufficiently allege that the seizure and destruction of his property caused him to suffer an objectively serious injury. At best, he alleges that the seizure of his glasses—which were among the property taken by Upole and Winters and which he states he needs to see faces—caused him to be less aware of his surroundings on the day he was assaulted and stabbed in the head. But he does not explain how, had he been wearing his glasses and been better able to see faces, he would have been any less likely to be ambushed from behind by an inmate who was hiding in the shower. Nor does he sufficiently allege that the seizure of his property deprived him of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347. Moreover, to the extent that Meek-Freeman claims that his placement in lockup following

the search amounted to cruel and unusual punishment, he alleges no facts from which the Court could plausibly infer that the conditions on lockup constituted an injury or deprivation that was sufficiently serious to amount to an Eighth Amendment violation. Meek-Freeman fails to state an Eighth Amendment claim against Upole and Winters.

Meek-Freeman's First Amendment retaliation claim against Upole and Winters may proceed. His Fourth Amendment claim against Upole and Winters is dismissed with prejudice. His Eighth Amendment claim against Upole and Winters is dismissed without prejudice.

### 5.  Claim Against Brewer and Kitzmiller

Meek-Freeman claims that Brewer and Kitzmiller violated the Eighth Amendment by subjecting him to excessive force when they maced him in his open head wound after he had been stabbed. The Court concludes that Meek-Freeman has stated a plausible claim for excessive force against Brewer and Kitzmiller.

An officer violates an inmate's Eighth Amendment right when he subjects the inmate to "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To state an Eighth Amendment excessive force claim, the inmate must allege facts sufficient to indicate that the officer intentionally inflicted serious injury on him and did so "with a sufficiently culpable state of mind." *Williams*, 77 F.3d at 761. An officer acts with a sufficiently culpable state of mind when he inflicts force "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). Factors for consideration are: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) 'any efforts

made to temper the severity of a forceful response.'" *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley*, 475 U.S. at 321). An officer's use of "mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain" constitutes a violation of the Eight Amendment's prohibition against cruel and unusual punishment. *Williams*, 77 F.3d at 763 (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)), *see also Iko*, 535 F.3d at 239–40; *Dean v. Jones*, 984 F.3d 295, 305 (4th Cir. 2021) (officer's use of pepper spray against prisoner who was restrained and lying on his back supported a finding of malice).

Meek-Freeman has alleged an excessive force claim against Brewer and Kitzmiller. Meek-Freeman asserts that the officers watched him be stabbed by another inmate and then, when he was clearly injured and bleeding, maced him directly in his head wound. Viewing the allegations in the light most favorable to Meek-Freeman, he has set forth sufficient facts to plausibly allege that Brewer and Kitzmiller used mace unnecessarily and solely for the purpose of hurting him, the victim of the attack. Meek-Freeman thus has plausibly stated a claim for excessive force against Brewer and Kitzmiller.[7]

Meek-Freeman's excessive force claim against Brewer and Kitzmiller may proceed.

### 6. Claims Against Brian T. Schrock

Meek-Freeman alleges that Brian T. Schrock violated the Fourth and Eighth Amendments as well as PREA by needlessly strip-searching him three times after a non-contact visit. Meek-Freeman fails to state a claim on any of these asserted bases.

---

[7] Although the state defendants move to dismiss the entire complaint, they do not argue in the memorandum supporting their motion that Meek-Freeman has failed to state a claim for excessive force against Brewer and Kitzmiller. Rather, they argue that the evidence attached to their motion demonstrates that Brewer and Kitzmiller's use of force "was appropriate and consistent with applicable policies to gain compliance from recalcitrant incarcerated individuals." ECF 24-1, at 21. Because, as explained in part III.D of this opinion, the Court is not treating the state defendants' motion as a motion for summary judgment, it does not consider these arguments at this stage.

In evaluating whether a strip search violates the Fourth Amendment, the court "must examine the search in its complete context and consider the following factors: (1) the scope of the particular intrusion; (2) the manner in which the search was conducted; (3) the justification for initiating the search; and (4) the place in which the search was performed." *Johnson v. Robinette*, 105 F.4th 99, 114 (4th Cir. 2024) (quoting *Sims v. Labowitz*, 885 F.3d 254, 261 (4th Cir. 2018)). The first two factors "may 'involve overlapping inquiries.'" *Id.* at 116–17 (quoting *Sims*, 885 F.3d at 261). Whether a search was reasonable defies "precise definition or mechanical application." *Id.* at 114 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). "[A] sexually invasive search," such as a strip search, "constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Sims*, 885 F.3d at 261 (quoting *Wood v. Clemons*, 89 F.3d 922, 929 (1st Cir. 1996)).

The Court assumes that Meek-Freeman has plausibly alleged that Brian T. Schrock's strip searches were not justified by any need to discover contraband. The Court makes this assumption because Meek-Freeman alleges that he had previously gone through an X-ray and the strip searches occurred after non-contact visits. *But see Johnson*, 105 F.4th at 117 (noting that "visual-only" inspections for contraband during a strip search "have long been recognized as a valid tool . . . that may be utilized [by corrections officers] *without any particularized suspicion*") (emphasis added). Nonetheless, on the facts that Meek-Freeman has alleged, the other three factors weigh against him. He does not allege that the strip searches were conducted in a public place or that they were conducted in view of any other officers. *See id.* at 116 (noting that "[t]he question whether a sexually invasive search is conducted in a private or a public setting is especially relevant to this Court's determination of reasonableness" (quoting *United States v. Edwards*, 666 F.3d 877, 883 (4th Cir. 2011))). With respect to the scope of the intrusion and the manner that the searches were

conducted, Meek-Freeman makes no allegation that Brian T. Schrock touched him, sexually or otherwise, during the searches. *See Johnson*, 105 F.4th at 117; *see also Calloway v. Lokey*, 948 F.3d 194, 204 (4th Cir. 2020) (strip search in private area in which two female officers instructed female prison visitor to remove clothing, lift arms and breasts, open mouth, shake hair, remove tampon, squat and cough, and spread buttocks was conducted "professionally and in an appropriate setting"). Although Meek-Freeman alleges that Brian T. Schrock made unspecified "comments about [his] private part[s]," the Court cannot infer—without any additional information about what Brian T. Schrock actually said—that these comments were sufficiently inappropriate, in the context of a strip search, to render its manner and scope unreasonable. Meek-Freeman has not plausibly alleged that Brian T. Schrock violated his Fourth Amendment rights when Brian T. Schrock strip searched him.

Meek-Freeman also fails to state a claim that the strip searches violated his Eighth Amendment rights. An inmate who is sexually assaulted by prison guards "suffer[s] [a] grave deprivation[] of [his] Eighth Amendment rights." *Woodford v. Ngo*, 548 U.S. 81, 118 (2006) (Stevens, J., dissenting). "A correctional officer's intentional contact with an inmate's genitalia or other intimate area, which serves no legitimate penological purpose and is undertaken with the intent to gratify the officer's sexual desire or to humiliate the inmate, violates the Eighth Amendment." *Johnson*, 105 F.4th at 122 (quoting *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015)). However, a correctional officer's intimate contact with an inmate's private area during a strip search only constitutes sexual abuse actionable under the Eighth Amendment if the officer "had the requisite malicious intent to sexually abuse the inmate, sexually arouse the inmate or himself, or otherwise gratify sexual desire." *Johnson*, 105 F.4th at 122.

Meek-Freeman does not allege that Brian T. Schrock touched him at all during the strip search. That dooms his Eighth Amendment claim.

Meek-Freeman also fails to state a claim against Brian T. Schrock for a violation of PREA. "Congress passed the PREA to, *inter alia*, 'establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States' and 'protect the Eighth Amendment rights of Federal, State, and local prisoners.'" *Id.* at 107 (quoting 34 U.S.C. § 30302(1), (7)). Courts in this district consistently have concluded that PREA does not create a private cause of action for prisoners to sue for non-compliance with the statute. *See, e.g.*, *Doe v. Anne Arundel Cnty.*, No. JRR-23-3451, 2025 WL 675059, at *2 n.3 (D. Md. Mar. 3, 2025); *Stanfield v. Thorton*, No. JKB-24-3418, 2025 WL 437858, at *2 (D. Md. Feb. 7, 2025); *Williams v. Dovey*, No. DKC-15-1891, 2016 WL 810707, at *7 (D. Md. Mar. 2, 2016). So have various courts of appeals. *See, e.g.*, *Krieg v. Steele*, 599 F. App'x 231, 232–33 (5th Cir. 2015); *Kalu v. Spaulding*, 113 F.4th 311, 333–34 (3d Cir. 2024); *Beverly v. Cnty. of Orange*, No. 22-55080, 2022 WL 14003695, at *1 (9th Cir. Oct. 24, 2022). *But see also Cox v. Nobles*, 15 F.4th 1350, 1361 (11th Cir. 2021) (declining to decide whether PREA "offers a standalone cause of action"). Courts tend to base this conclusion on the absence of any statutory language in PREA "suggest[ing] that Congress intended to create a private right of action for prisoners to sue for non-compliance." *See Stanfield*, 2025 WL 437858, at *2; *see also Beverly*, 2022 WL 14003695, at *1 (stating that PREA does not create a private right of action and citing to *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001), in which the Supreme Court stated that absent statutory intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute"). Though the Fourth Circuit has not yet weighed in on this issue, this Court follows the weight of existing

authority and concludes that PREA does not create a private cause of action for prisoners. Accordingly, Meek-Freeman's PREA claim must be dismissed with prejudice.

Meek-Freeman's Fourth and Eighth Amendment claims against Brian T. Schrock are dismissed without prejudice. His PREA claim against Brian T. Schrock is dismissed with prejudice.

### 7.   Claim Against Brian K. Schrock

Meek-Freeman alleges that Brian K. Schrock got him fired from his job at WCI because Meek-Freeman filed a grievance against Brian T. Schrock for sexual assault in connection with the strip searches discussed in the previous section. He alleges that Brian K. Schrock thereby committed First Amendment retaliation. The state defendants argue that Meek-Freeman fails to state a claim. The Court agrees.

Filing a grievance against Brian T. Schrock through established procedures clearly constitutes protected activity under the First Amendment. *See Booker*, 855 F.3d at 545. However, aside from the fact that Brian K. Schrock and Brian T. Schrock share a first and last name, Meek-Freeman alleges no facts to support his contention that Brian K. Schrock had him fired because he filed that grievance. Even assuming these men are related, Meek-Freeman does not plead any facts showing that his grievances filed at NBCI were communicated to Brian K. Schrock at WCI or motivated his actions in any other way. He fails to state a claim for First Amendment retaliation.

Meek-Freeman's claim against Brian K. Schrock is dismissed without prejudice.

### 8.   Claims Against Davis

Meek-Freeman alleges that Davis violated his First Amendment rights by interfering with the mailing of legal paperwork to Meek-Freeman's lawyer. The Court understands Meek-Freeman to assert a violation of his right to access the courts. Meek-Freeman also alleges that Davis violated

his due process rights by failing to "turn in [his] money slip . . . to see [Meek-Freeman's] property home." ECF 1, at 23. Meek-Freeman fails to state a claim against Davis on either basis.

Prisoners have a constitutionally protected right of access to the courts, pursuant to which they must be afforded a "reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." *Lewis v. Casey*, 518 U.S. 343, 356 (1996). This right "guarantees . . . the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts," not a "particular methodology" for bringing claims. *Id*. To state a claim for denial of access to courts, a plaintiff must allege "'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 356); *see Lewis*, 518 U.S. at 351–52. That is, the plaintiff must allege that the defendants "frustrated or . . . impeded" a "nonfrivolous legal claim." *Lewis*, 518 U.S. at 353. And, the plaintiff "must . . . identify an actual injury resulting from [that] official conduct." *Cochran*, 73 F.3d at 1317 (citing *Strickler v. Waters*, 989 F.2d 1375, 1382–85 (4th Cir. 1993)); *see also Pronin v. Johnson*, 628 F. App'x 160, 161 (4th Cir. 2015) (noting "a prisoner must demonstrate that he suffered an actual injury, such as missing a court-imposed deadline or being unable to file a complaint because of the Defendants' actions" (citing *Lewis*, 518 U.S. at 351–52)).

The right of access "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). "It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Id.* The description of the predicate claim must be sufficient to allow an assessment of whether it was "nonfrivolous" or "arguable." *Id.*

Meek-Freeman does not provide more than conclusory allegations against Davis for denying him access to the courts. Meek-Freeman states that Davis failed to send his legal mail but fails to explain what, if any, actual injury he suffered in the context of his post-conviction criminal proceedings as a result of Davis's alleged misconduct. Nor does Meek-Freeman explain what nonfrivolous legal claim he sought to pursue with the documents he attempted to mail to his attorney. Furthermore, to the extent that Meek-Freeman asserts a due process violation in connection with Davis's alleged failure to turn in his money slip and resulting loss of his property, Meek-Freeman fails to state a claim because, as discussed previously, he has an adequate remedy available under Maryland state law.

Meek-Freeman's claims against Davis are dismissed without prejudice.

### C.  Claims Against Doe

Meek-Freeman claims that Doe violated the Eighth Amendment by failing to protect him from being stabbed. Meek-Freeman also claims that Doe allowed him to be stabbed in retaliation for his use of the prison grievance process, which the Court construes as a First Amendment retaliation claim.[8] Meek-Freeman fails, however, to state a claim against Doe on either basis.

"The Eighth Amendment protects prisoners from 'unnecessary and wanton infliction of pain.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Estelle*, 429 U.S. at 102). Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of . . . inmates." *Id.* (quoting *Whitley*, 475 U.S. at 319–20). "Being violently assaulted in

---

[8] Even though no one has moved to dismiss the claims against Doe, the Court must review the adequacy of Meek-Freeman's allegations against Doe. Meek-Freeman has filed suit without prepaying the filing fee, which he may do under 28 U.S.C. § 1915(a)(1). To guard against possible abuses of this privilege, the statute requires dismissal of any complaint that is frivolous, malicious, or fails to state a claim on which relief may be granted. 28 U.S.C. §§ 1915(e)(2)(B)(i)–(ii), 1915A(b).

prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes*, 452 U.S. at 347).

"Prison officials violate the Eighth Amendment's cruel-and-unusual-punishment clause when they are deliberately indifferent to a substantial risk to an inmate's safety . . . ." *King v. Riley*, 76 F.4th 259, 264 (4th Cir. 2023). To state a failure-to-protect claim, the prisoner must plausibly allege an objective and a subjective element. *Id.* First, he must allege an objectively "substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 834)). Second, the prisoner must allege that the defendant "subjectively recognized a substantial risk of harm" and "subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)) (emphasis in *Anderson* removed). The objective inquiry requires the court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A prison official who knew of a risk and "'responded reasonably to the risk' cannot be found liable under the Eighth Amendment." *King*, 76 F.4th at 264 (quoting *Farmer*, 511 U.S. at 844).

The subjective inquiry requires a showing of deliberate indifference, which is "a very high standard" that requires more than "a showing of mere negligence." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015). The Supreme Court delineated the difference between tort liability and liability for a constitutional violation:

> The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. *See Prosser and Keeton* §§ 2, 34, pp. 6, 213–214; *see also* Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680; *United States v. Muniz*, 374 U.S. 150 (1963). But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837–38.

Meek-Freeman alleges that he was placed on a tier with another inmate, Jackson, who was known to be his enemy, yet he does not claim that Jackson was the inmate who attacked him, and the documents he has attached to his complaint identify Martin as his attacker. Nonetheless, the Court assumes for purposes of this analysis that being placed on a tier with Jackson exposed Meek-Freeman to an objectively substantial risk of serious harm. Still, Meek-Freeman fails to allege that Doe responded unreasonably to that risk. Meek-Freeman alleges that when he informed Doe that he was in danger, Doe moved him to a different cell but not to a different tier or building. While Meek-Freeman might understandably have felt safer had he been moved to a different tier or building, by Meek-Freeman's own allegations, inmates in different "line-ups" of cells were not allowed out of their cells at the same time. Meek-Freeman does not allege that Doe allowed him to remain in the same line-up as Jackson. Indeed, it appears from Meek-Freeman's complaint that Doe may have moved him to a different line-up, containing cells 2B57–2B64; Meek-Freeman alleges that Jackson was housed in cell 2B14. Meek-Freeman does not otherwise allege facts showing that relocation to another cell—in an environment where inmates' out-of-cell movement was highly restricted—was an unreasonable way for Doe to respond to the risk that Jackson posed. Moreover, even if, as Meek-Freeman alleges, the inmate who attacked him should not have been

out of his cell at the same time as him, Meek-Freeman does not allege any facts that indicate Doe had any involvement in this security breach.

Meek-Freeman also fails to state a claim against Doe for First Amendment retaliation. He claims that Doe failed to protect him from being stabbed in retaliation for his filing inmate grievances. As the Court has discussed, Meek-Freeman fails to allege that Doe's actions amounted to a failure to protect him, and he thus fails to allege that Doe took any adverse action to chill the exercise of his First Amendment right. Moreover, even if Meek-Freeman had plausibly alleged that Doe failed to protect him, his conclusory allegation that Doe did so because Meek-Freeman filed grievances does not rise above speculation. Meek-Freeman alleges no specific facts to indicate that Doe was even aware that he had filed grievances, much less that his use of the grievance procedure motivated Doe to put him in harm's way.

Meek-Freeman's claims against Doe are dismissed without prejudice.[9]

---

[9] Meek-Freeman has sued all defendants in their individual and official capacities for damages. He has also sued them in their official capacities for prospective declaratory and injunctive relief: an injunction ordering the defendants "to cease their physical violence and threats towards [him]" and a declaratory judgment that "the acts and omissions described herein violate his rights under the constitution and laws of the United States," which he states are necessary to stop the defendants from further injuring him. ECF 1, at 25–26. The Medical Department, as discussed, is not subject to suit under § 1983, so all of Meek-Freeman's claims against it—whether styled as "official capacity" or "personal capacity" claims—are dismissed. Meek-Freeman's official capacity claims for damages against Doe and the state defendants are barred by the Eleventh Amendment. *See, e.g.*, *Republic of Paraguay v. Allen*, 134 F.3d 622, 627–28 (4th Cir. 1998). Though prospective injunctive and declaratory relief against a state actor in their official capacity is not barred by Eleventh Amendment immunity, *see, e.g.*, *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 292 (4th Cir. 2001), Meek-Freeman's official capacity claims for declaratory and injunctive relief against Doe and the state defendants fail. First, with respect to Meek-Freeman's excessive force claim against Brewer and Kitzmiller and his First Amendment retaliation claim against Upole and Winters, Meek-Freeman has not plausibly alleged that an unconstitutional policy or custom caused his injuries—a prerequisite for any official capacity claim. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (a plaintiff suing a defendant in their official capacity must allege that "the entity's 'policy or custom' . . . played a part in the violation of federal law" (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978))). Second, with respect to his remaining claims against Doe

### D.  Meek-Freeman's Rule 56(d) Declaration

Meek-Freeman has stated an excessive force claim against Brewer and Kitzmiller, and his First Amendment retaliation claim against Upole and Winters survived the state defendants' motion to dismiss. The state defendants also move for summary judgment on these claims. ECF 24, at 1. Meek-Freeman has filed a declaration pursuant to Rule 56(d) in which he states that it would be impossible for him to respond fully to a motion for summary judgment without being able to conduct additional discovery. ECF 21, ¶ 10. The state defendants have not responded to this declaration.

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment, however, is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011); *see Shaw v. Foreman*, 59 F.4th 121, 128 (4th Cir. 2023); *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014).

---

and the state defendants, Meek-Freeman fails to plausibly allege a constitutional violation for the reasons discussed in this opinion.

A party opposing the conversion of a motion to dismiss into one for summary judgment must, ordinarily, submit a Rule 56(d) declaration setting forth their reasons for opposition. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). Even without a Rule 56(d) declaration, the court may consider whether the nonmoving party "adequately informed the [] court that the motion [for summary judgment] is [premature] and more discovery is necessary." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). The Fourth Circuit has emphasized that discovery is "broadly favored" in advance of reaching summary judgment and district courts are to afford *pro se* plaintiffs leniency in regard to the requirements of Rule 56(d). *See, e.g.*, *Farabee v. Gardella*, 131 F.4th 185, 193–95 (4th Cir. 2025). Relief under Rule 56(d) should be "liberally granted," especially "in the context of *pro se* litigation," *Jenkins v. Woodard*, 109 F.4th 242, 251 (4th Cir. 2024) (italics added) (citing *Pledger v. Lynch*, 5 F.4th 511, 526 (4th Cir. 2021)), "when a case involves complex factual questions about intent and motive," or "the relevant facts are exclusively in the control of the opposing party." *Harrods Ltd.*, 302 F.3d at 247 (quoting 10B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Fed. Prac. & Proc.* § 2741, at 419 (3d ed. 1998)).

In his Rule 56(d) declaration, Meek-Freeman asserts that he requires discovery to respond to a motion for summary judgment. ECF 21, ¶ 10. As relevant to his excessive force claim, Meek-Freeman states that he wants to depose witnesses concerning NBCI's "policy on head injuries and stabbings" and to identify the people who were responsible for his care on the day he was stabbed. *Id.* ¶ 12. Meek-Freeman contends that, without being able to conduct discovery, he cannot present a full record and respond to the defendants' various arguments for summary judgment and thus such a ruling would be premature. *Id.* ¶¶ 8, 14. Meek-Freeman's Rule 56(d) declaration does not identify the discovery he needs to respond to the First Amendment retaliation claim.

In addition to a Rule 56(d) affidavit, Meek-Freeman also has filed a request for counsel, in which he states that he needs the assistance of counsel for the discovery process, because defendants are solely in possession of relevant evidence needed to support his claims. ECF 14, at 2. Additionally, he states that due to his incarceration, he has limited access to materials and may be denied certain information due to security concerns. *Id.*

Based on Meek-Freeman's declaration, the Court concludes that he has adequately informed the Court that it would be premature to adjudicate the state defendants' motion as a motion for summary judgment and that more discovery is necessary on his excessive force claim. And even though he does not identify the discovery he needs to defeat summary judgment on his First Amendment retaliation claim, the Court finds summary judgment on that fact-specific claim premature. At this preliminary stage, the Court finds that Meek-Freeman is entitled to discovery on both claims, including as to whether Brewer and Kitzmiller acted with malicious or sadistic intent when they allegedly maced him and whether Upole and Winters retaliated against him for exercising his First Amendment rights. The Court thus will not, at this juncture, consider whether the defendants are entitled to summary judgment on Meek-Freeman's excessive force claim against Brewer and Kitzmiller or his First Amendment retaliation claim against Upole and Winters.

### E.  Meek-Freeman's Request for Appointment of Counsel

Meek-Freeman requests appointment of counsel. ECF 14. "[D]istrict courts have discretion to appoint counsel in civil cases and abuse that discretion by declining to do so 'where the case of an indigent person presents exceptional circumstances.'" *Jenkins*, 109 F.4th at 247 (quoting *Whisenant v. Yuam*, 739 F.2d 160, 162 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989)). Exceptional circumstances exist if (1) a plaintiff "has a 'colorable claim'" and (2) "considering the claim's objective complexity and the plaintiff's

subjective abilities . . . the plaintiff 'lacks the capacity to present it.'" *Id.* (quoting *Whisenant*, 739 F.2d at 162).

Meek-Freeman has colorable excessive force and First Amendment retaliation claims. Meek-Freeman does not have the capacity to present these claims. Meek-Freeman is incarcerated and has informed the Court, in his Rule 56(d) declaration, that he has "no experience with the legal system." ECF 21, at 1. In his request for appointment of counsel, Meek-Freeman further states that he is not a lawyer and requires one to assist him with the discovery process, because the defendants "are in possession of evidence needed to support his claims" and he is concerned that they will deny him access to these materials. ECF 14, at 2. On the current undeveloped record, Meek-Freeman's version of events giving rise to his claims differs markedly from the defendants' version. Discovery on his claims will involve investigation, witness interviews, depositions, document requests and production. Meek-Freeman, an incarcerated prisoner in a maximum-security state prison with no formal legal training, does not have the capacity to pursue these claims on his own. *See, e.g.*, *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (plaintiff lacked capacity to present claim because he was "relatively uneducated generally and totally uneducated in legal matters," was unable to leave prison to interview relevant witnesses, case turned on credibility contest between different versions of underlying events, and plaintiff was untrained in cross-examination). The Court finds exceptional circumstances warrant the appointment of an attorney to represent Meek-Freeman under 28 U.S.C. § 1915(e)(1).

### F.  Meek-Freeman's Request for a Protective Order

In the same motion in which he requests appointment of counsel, Meek-Freeman also requests that the Court issue a protective order, stating that "if the record is fully public . . . he believe[s] someone will do something to hurt him again." ECF 14, at 2.

"When parties 'call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials.'" *Doe v. Public Citizen*, 749 F.3d 246, 271 (4th Cir. 2014) (quoting *Union Oil Co. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000)). The public has a right of access to documents filed in this Court, either under the common law or the First Amendment. *Id.* at 266. Under the common law, which "extends to all judicial documents and records," the "presumption [of right of access] can be rebutted only by showing that 'countervailing interests heavily outweigh the public interests in access.'" *Id.* (quoting *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)). Under the First Amendment, "access may be restricted only if closure is 'necessitated by a compelling government interest,' and denial of access is 'narrowly tailored to serve that interest.'" *Id.* (quoting *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986)). To protect these rights, Local Rule 105.11, which governs the sealing of all documents filed in the record, states in relevant part that "[a]ny motion seeking the sealing of pleadings, motions, exhibits or other documents to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection."

Meek-Freeman requests a protective order but does not identify which particular portions of the record he would like the Court to seal or explain why alternatives to sealing would be insufficient. Nor does he make factual representations sufficient to justify sealing. He states broadly that he fears that, due to the seriousness of his complaints and the power of some of the defendants, someone in the Maryland prison system will hurt him if the record is public. ECF 14, at 2. However, the only concrete factual representation he makes to support that speculation is that an unspecified correctional officer, at an unspecified time, told him that he had "heard [Meek-Freeman] [was] attacking our liv[e]l[i]hood," and that this comment has left him "a little worried

about his safety." *Id.* This is not sufficient to establish that Meek-Freeman's interest in keeping the record (or portions of it) secret heavily outweighs the public's common-law right of access to the case. His request for a protective order is denied.

### G. Meek-Freeman's Motion for Relief from Judgment

Meek-Freeman also has filed a "motion for relief from judgment" in which he seeks his immediate release from custody due to numerous alleged errors in his state criminal proceedings. ECF 20, at 16. This case is not the proper forum for such a request. If Meek-Freeman believes that his conviction is invalid, he may file a petition for writ of habeas corpus in a separate action. *See, e.g.*, *Griffin v. Baltimore Police Dep't*, 804 F.3d 692, 694–95 (4th Cir. 2015) ("Habeas corpus, and not § 1983, is the exclusive federal remedy for state prisoners seeking actual release from confinement."). His motion is denied.

### H. The State Defendants' Motion to Seal

The state defendants have filed a motion to seal Exhibit D of their motion to dismiss or, in the alternative, for summary judgment. ECF 26. "[T]he First Amendment right of access attaches to materials filed in connection with a summary judgment motion." *Doe*, 749 F.3d at 267 (citing *Rushford*, 846 F.2d at 252–53). Accordingly, the state defendants must show that sealing is "necessitated by a compelling governmental interest," and that the denial of access they seek is "narrowly tailored to achieve that interest." *Id.* at 266 (quoting *In re Wash. Post Co.*, 807 F.2d at 390).

In support of their motion to seal, the state defendants state that Exhibit D contains sensitive information that is not in the public record and may impact Meek-Freeman's safety and security at his institution. *Id.* at 2. Protecting Meek-Freeman's safety qualifies as a compelling state interest. *See, e.g.*, *McRae v. Johnson*, 261 F. App'x 554, 558 (4th Cir. 2008) ("maintaining the health and

safety of inmates and staff" in a correctional setting is a compelling state interest); *accord Jehovah v. Clarke*, 798 F.3d 169, 178 (4th Cir. 2015). Furthermore, the state defendants represent that redaction of Exhibit D would remove information necessary to support their motion, ECF 26, at 2. The Court, having reviewed the state defendants' motion and Exhibit D, agrees. Under these circumstances, the Court is satisfied that sealing a single exhibit would be narrowly tailored to achieve the compelling governmental interest in protecting Meek-Freeman's safety. The Court grants the motion to seal.

## IV.    Conclusion

The Medical Department's motion to dismiss is granted. Meek-Freeman's claim against the Medical Department is dismissed with prejudice.

The state defendants' motion to dismiss or in the alternative for summary judgment, treated as a motion to dismiss, is granted in part and denied in part. Meek-Freeman's excessive force claim against Brewer and Kitzmiller in their individual capacities and his First Amendment retaliation claim against Upole and Winters in their individual capacities may proceed. The following claims against the state defendants are dismissed with prejudice: Meek-Freeman's due process claim against Self for loss of his property; Meek-Freeman's Fourth Amendment claim against Upole and Winters; and Meek-Freeman's PREA claim against Brian T. Schrock. All other claims against the state defendants are dismissed without prejudice. Meek-Freeman's claim against Doe also is dismissed without prejudice. With respect to the claims that are dismissed without prejudice, Meek-Freeman shall have the opportunity to amend his complaint.

Meek-Freeman's request for appointment of counsel is granted. His requests for a protective order and for relief from judgment are denied. The state defendants' motion to seal is granted.

A separate Order follows.

September 30, 2025
_____
Date

_____
Deborah L. Boardman
United States District Judge